129 So.2d 194

Hunter JONES et al.

v.

J. W. HOGUE et al.

No. 45026.

Dec. 12, 1960.

Brandon, Brandon, Hornsby & Handy, Natchez, Miss., Breazeale, Sachse & Wilson, Baton Rouge, for applicants.

Lloyd F. Love, Ferriday, Blanchard, Goldstein, Walker & O'Quin, Shreveport, for plaintiffs-appellants-respondents.

HAWTHORNE, Justice.

Plaintiffs and defendants are riparian proprietors of adjacent tracts of land, the plaintiffs' tract being known as the Barker tract and the defendants' as the Hogue tract. Over the course of the years an alluvion has formed by accretion in front of both tracts, which are situated in a curve or bend of the Mississippi River known as Esperance Point. Formation of this alluvion began in front of the Hogue tract, and over the years, as accretion continued successively and imperceptibly, the

alluvion extended in front of the Barker tract also. This alluvion now extends across the entire front of both properties. The Mississippi River, which formerly made a large loop around the alluvion, was diverted in 1933 by means of a channel dug by the U. S. Engineers, known as Glasscock Cut-off, and at the present time the main channel of the river is down one side of the alluvion and through this cutoff. Its old channel is now known as Deer Park Bend.

The owners of the Barker tract, with their ·lessee, instituted this suit under the declaratory judgments act to have the court declare the manner of dividing or apportioning the alluvion formed in front of the two tracts.

Plaintiffs contend that the dividing line of the alluvion should be drawn so as to give them that portion of the entire acreage in the alluvion formed in front of both the properties as the length of the original front line of their property bears to the length of the original front line of all the properties which the alluvion joins. For example, if the total extent of the front line of both tracts was 300 feet, plaintiffs' front being 100 feet and defendants' 200 feet, it is plaintiffs' contention that the alluvion should be divided so as to award them one-third, or 33⅓ per cent, of the area or acreage of the entire alluvion.

Defendants, the Hogues and their lessee, contend on the other hand that the alluvion which formed only in front of their property belongs to them and should not be divided, that only the alluvion which formed in front of both properties should be apportioned, and that this apportionment should be made by taking as a base the entire riparian front line of each riparian owner including any accretions theretofore formed to either. They contend also that the boundary should be determined by dividing the new frontage in proportion to the former river frontage, and that the apportionment of the alluvion should be made on a proportionate frontage-to-frontage basis and not on an acreage-to-frontage basis as plaintiffs contend.

The pertinent articles of the Civil Code are as follows:

"Art. 509. The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion.

"The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or stream, and whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for the public use."

"Art. 516. If an alluvion be formed in front of the property of several riparian proprietors, the division is to be made according to the extent of the front line

of each at the time of the formation of the alluvion."

The trial judge agreed with the defendants that the apportionment or division of the alluvion should be on a frontage-to-frontage basis. He then stated that "each time the river falls leaving an accretion, a division should be made by alloting to each tract its share of the new frontage". He observed that hydrographic charts showing the extent of the alluvial formations for the years 1909,[1] 1929–1930, 1933, 1937, and 1941 were in the record in this case, those being the "only periods or years when the Mississippi River Commission made surveys of this area". The trial judge made five divisions of the alluvion on the basis of the five surveys showing the deposits of accretion, and attributed to each tract its proportionate share of the frontage. Thus, in the case of the Hogue lands he used five different "front lines", the first being the original frontage on the river of the two tracts, and the other four front lines being around the gradually expanding mass of alluvion, as described by government surveys for (1) 1909, (2) 1929–1930, (3) 1933, (4) 1937, and (5) 1941. From this judgment of the district court the plaintiffs, owners of the Barker tract and their lessee, appealed to the Court of Appeal, Second Circuit.

That court in its opinion accepted the frontage-to-frontage theory of division, but reversed the district court as to the method of making this division or apportionment. In other words, the Court of Appeal did not use, as did the district court, the various government surveys, but concluded that the dividing line of the alluvion should be drawn so as to give to plaintiffs and defendants a new frontage on the perimeter of the alluvion proportionate to their original frontages on the river, that the division line should be drawn between the two pieces of alluvion on this frontage basis, and that this apportionment or division should be made at the time the apportionment between the riparian owners was sought. See 116 So.2d 334. From this holding the Hogues applied to this court for a writ of certiorari, which was granted.

For convenience of this court plaintiffs attached to their brief a plat adapted from Plaintiff Exhibit 1. We reproduce that map here for a better understanding of the terrain involved, the issues raised by the litigants, and the holdings of the district court and the Court of Appeal. It must be borne in mind that no survey or actual division of this acreage has been made on the ground, and that neither the length of the present perimeter of the alluvion nor the area of the alluvion is known.

1. The 1909 survey was the first to show that the alluvion, which had been forming in front of the Hogue lands alone, had extended to the front of the Barker lands. These official maps were prepared by the U. S. Engineers for the Mississippi River Commission.

On this map the original front on the river of the two tracts here involved is designated A-B-C. The trial judge said the alluvion should be divided by an irregular line from Point B through Point E-1 to Point E-2. On this line we have added and circled the numbers 1, 2, 3, 4, and 5. Each of these numbers represents a point on the perimeter of the gradually expanding alluvion shown by the government surveys of (1) 1909, (2) 1929–1930, (3) 1933, (4) 1937, and (5) 1941, as used by the trial judge in

making his five divisions of the alluvion. The Court of Appeal in rejecting the trial judge's method of apportionment said the line should be run from Point B to Point X.

The Hogues, defendants in the court below and relators here, in support of their contention that the judgment of the district court is correct say that the Court of Appeal erred in "refusing to recognize that alluvion formed before the property of a single riparian owner becomes his alone, that not until alluvion is formed before more than one property is there anything to be divided, and that divisions thus due are not altered by the formation of still further alluvion". We granted this writ not because we thought that the Court of Appeal had erred in this respect, but because of the state of the jurisprudence on the question of division or apportionment of alluvion formed in front of the property of several riparian proprietors. This jurisprudence will be discussed below.

Relators argue that the ownership of all alluvion which formed in front of their tract of land before any was deposited or formed before the Barker tract vested in them under Article 509 of the Civil Code, which provides that alluvion belongs to the owner of the soil situated on the edge of the water. They say that ownership comes before the establishing of a boundary, and that ownership once acquired under this article cannot thereafter be divested under Article 516. As stated by counsel for respondents in

their brief, relators' contention is to the effect "that the division of the alluvion is an automatic process and that as each particle of alluvion is attached to the soil it should be divided in accordance with the ownership existing at that time; and thus, in effect, if the alluvion commences forming in front of one of the riparian owners' property, he should not only have the benefit of that which forms in front of his property, but may utilize it to acquire a portion of that which subsequently forms in front of the adjoining proprietors' property".

This record discloses, as stated previously, that the formation of this alluvion began in front of the Hogue tract, and that over the years, as accretion continued successively and imperceptibly, the alluvion extended in front of the Barker tract also. Under these circumstances we can only conclude, as did the Court of Appeal, that all of the alluvion formed in front of these two tracts must be apportioned pursuant to the provisions of Article 516 of the Civil Code.

The Court of Appeal said of this phase of the case [116 So.2d 338]:

"We think some misconceptions with respect to the problem of apportionment may be due to an inexact appreciation of the language used in LSA–C.C. Article 516. It must be admitted that the language of the Article is not entirely clear. Both the district judge and counsel for defendants

interpret the article as providing that the *division or apportionment* is to be made as of *the time of the* formation of the alluvion. If this construction should be correct, then it follows that the method of apportionment followed by the trial judge upon the basis of the five successive surveys of alluvial deposits, would have some merit. However, as we appreciate the text of the article, the phrase—'* * * at the time of the formation of the alluvion.'—*relates not to the apportionment but rather to the existence and extent of the front lines of the properties of riparian owners.*[2]

■■ "We think our construction is justified not only by the interpretation of the language itself but by further and more concrete considerations. Illustrating on the basis of the facts of the instant case, while it is quite true that the five hydrographic surveys made at different periods of time show substantial increases in the area and extent of the alluvial formations, it is not true that these surveys accurately reflect the periods at which the alluvial formations and the successive stages thereof became perceptible and susceptible of division. It could not be contended and, indeed, has not been, that the survey of 1909, for example, accurately fixed the extent of the alluvial deposit 'at the time of the formation' there-

of. Unquestionably, the time of formation, or, certainly, the beginning of and addition to the formation of the deposit must have occurred in natural course of many years before the making of the survey. We think, therefore, it logically follows that surveys in themselves are not sufficient to establish the time of formation of the alluvion, and we doubt if, except in most unusual cases, the time of formation could be definitely established.

■■ "It is our opinion that courts must and should accept the extent and area of an alluvial deposit as it exists, be it much or little, at the time the apportionment between riparian owners is sought. To decide otherwise would have the impractical effect of holding that alluvial deposits must be apportioned, foot by foot, as they are formed. The periods between the surveys vary from three to twenty years, and there is no showing that the deposits formed by the imperceptible fluctuations in the opposed processes of accretion and dereliction remained consistent during any of these intervals. We are convinced that the issue of apportionment which is tendered for our determination presents as the subject of such apportionment *the entire alluvial deposit as it existed at the time this action was instituted without respect to the time ele-*

2. [In other words, the Court of Appeal was saying that the article means not that the division *is to be made at the time of the formation of the alluvion,* but that the division is to be made according to the *extent of the front line of each as it existed at the time of the formation of the alluvion.]

*ment of formation, grain by grain, foot by foot and acre by acre.*"

We think this is an excellent analysis of the problem, is well reasoned, and fully answers relators' contentions. Since we cannot improve on it, we have adopted it as our own.

As pointed out by respondents, apportionment according to the district court's method would have the effect in many cases of gradually excluding one or more riparian owners from the water front unless the process of accretion was uniform in front of each separate proprietor's estate and accretion formed before each proprietor's estate at the same rate as it formed on the adjoining estates. In this connection 56 Am.Jur. 905, Waters, Sec. 494, says:

"It undoubtedly is true that accretions formed in front of and contiguous to the land of several owners belong to them all, and cannot be claimed by one with whose land the first point of contact was made. The inevitable consequence of a contrary rule would be that if it could be shown that the point of contact was first made to lands of one of the riparian owners, he would be entitled thereby to the whole accretion subsequently made to the lands of other riparian owners on either side of him and thus would cut off their water boundaries and privileges."

See also 65 C.J.S. Navigable Waters § 84, p. 181; Crandall v. Allen, 118 Mo. 403, 24 S.W. 172, 22 L.R.A. 591.

We now come to a discussion of respondents' contention that the judgment of the Court of Appeal apportioning this alluvion on a frontage-to-frontage basis should be set aside, and that the dividing line of the alluvion should be drawn so as to give respondents that proportion of the entire acreage of the alluvion as the length of the front line of their property bears to the length of the front line of all the property to which the alluvion is attached. As stated previously, it is the condition of the jurisprudence on this question which caused this court to grant the writ.

The parties to this suit have cited to us four Louisiana cases in which this court had before it the question of the proper division of alluvion under Article 516 of the Civil Code, which provides that "If an alluvion be formed in front of the property of several riparian proprietors, the division is to be made according to the extent of the front line of each at the time of the formation of the alluvion".[3] It will be readily seen that this article does not specify a method of division or apportionment; all it does is to state plainly that the division is to be made on the basis of the extent of each owner's front line.

3. This article first appeared in our Code of 1825; it had no counterpart in our Code of 1808 or in the Code Napoleon.

The first of the cited cases is Heirs of Delord v. City of New Orleans, 1856, 11 La.Ann. 699. There this court in discussing the method of apportioning an alluvion between contiguous riparian proprietors stated:

"The line of such division must be drawn in such manner as that each of the contiguous riparian proprietors shall have such a proportion of the alluvial soil as the total extent of his front line bears to the total quantity of the alluvial soil to be divided."

In the Delord case the court apparently rejected an apportionment of the alluvion by prolongation of the division line between the properties there involved, for it stated that such a division would cross the batture in front of the properties obliquely up the river and in the course of time would exclude the plaintiffs from the river. The court stated that such a method of apportionment would exclude plaintiffs from the river altogether. It is to be observed that although the alluvion was apportioned on an acreage basis, yet great significance was placed on granting to the plaintiffs a river frontage. The court further stated that there was no case in the reports of any decision·construing Article 508 of the Code of 1825 (now Article 516), and then said that this was an indication that the understanding of the community and the profession had been unanimous on the subject.

In the next case, Newell v. Leathers, 1898, 50 La.Ann. 162, 23 So. 243, 245, this court in construing the provisions of Article 516 of the Civil Code had this to say:

"The language of Rev.Civ.Code, art. 516, is free from ambiguity: 'If an alluvion be formed *in front* of the property of several riparian proprietors, the division is to be made according *to the extent of the front line of each,* at the time of the formation of the alluvion.' (Italics ours.) * * * What *is* of consequence is the extent of the *old* frontage of the tracts on the water course, and from this is to be determined *the extent of the new frontage* on the water course. This excludes the idea of a proportionate area or acreage system of division between the several tracts fronting on the alluvion to be divided. Each proprietor of the original tracts takes the quantity of alluvion that may be between the lines of his old frontage on the water course measured forward to the new frontage. The lines by which the new frontage is reached may be parallel, or convergent, or divergent, according as the extent of the newly formed water line may be the same in the one case, or less in the other, or greater in the third, than the ancient water line of the tracts. [Citing numerous authorities] * * *

" 'This mode of distribution,' said the court in Deerfield v. Arms, supra, 'secures to each riparian proprietor the benefit of continuing to hold to the river shore, whatever changes may take place in the condition of the river by accretion, and the rule

·is obviously founded in that principle of ·equity upon which the distribution ought to be made.' *We do not interpret* [*Heirs of*] *Delord v. City of New Orleans, 11 L.An. 699, cited adversely, as establishing a different rule.*" (Italics in this paragraph are ours.)

In apportioning the alluvion to be divided ·in the Leathers case on a frontage-to-frontage basis the court cited and relied prin-·cipally on the case of Inhabitants of Deerfield v. Arms, 17 Pick., Mass. 41, which seems to be a leading case on the subject.

In the Deerfield case the court divided the alluvion on a frontage-to-frontage basis .according to a rule found in a work of the civil law, "A Collection of New Decisions", ·by Denisart, published in France in 1783. However, in the course of that opinion the ·court stated that in dividing alluvion "The ·object is, to establish a rule of division among these proprietors *which will do justice to each,* where no positive rule is prescribed, and where we have no direct judicial decisions to guide us" (italics ours), .and that in making such an equitable dis-·tribution two objects are to be kept in mind: "one is, that the parties shall have .an equal share in proportion to their lands, ·of the area of the newly formed land, re-.garding it as land useful for the purposes ·of cultivation or otherwise, in which the ·value will be in proportion to the quantity; the other is, to secure to each an access to ·the water, and an equal share of the river line in proportion to his share on the original line of the water, regarding such water line in many situations as principally useful for forming landing-places, docks, quays and other accommodations with a view to the benefits of navigation, and as such constituting an important ingredient in the value of the land." The court then said:

" * * * Without attempting to establish a rule of general application, we think that the one which shall most nearly, in general, accomplish these two conditions, will come nearest to doing justice."

In the Deerfield case the last statement quoted shows that the court there was not attempting to lay down a rule for general application. Under the general principle that the rule which will come nearest to accomplishing the two objects as there set out will come nearest to doing justice, it concluded that the rule applicable to the case it had under consideration was that found in Denisart's Collection of New Decisions.

If in Louisiana the Delord case establishes the area rule and the Leathers case establishes the frontage rule, then they certainly are in conflict. This court itself in the Leathers case, however, very plainly stated that it did not interpret the decision in the Delord case as establishing a rule different from that of the Leathers case. If this be true, the only way we could possibly interpret this statement is that the

court considered itself to be applying the rule which would give to the litigants in each case an equitable apportionment of the alluvion, under the principles stated in the Deerfield case upon which this court principally relied in reaching its decision in the Leathers case.

The third Louisiana case cited is Akard v. City of Shreveport, 1941, 196 La. 714, 200 So. 14, 16. This court in the course of its opinion after quoting Article 516 of the Civil Code also cited and quoted from the Delord case. No mention or discussion was made of the Leathers case, and our examination of the briefs filed in the Akard case discloses that the Leathers case was not even mentioned or cited. However, the decree itself, which gives to the City of Shreveport "fifty-four per cent (54%) of the alluvion, or 4.014 acres, lying next to and adjacent to the triangular tract or parcel owned by the City of Shreveport", clearly shows that the court there considered itself as apportioning the alluvion on the area basis.

The last case cited, Harper v. Learned, 1942, 199 La. 398, 6 So.2d 326, throws no light upon the subject. We note it only because of the court's statement there that Article 516 has been conflictingly interpreted in the Delord, Leathers, and Akard cases.

From this jurisprudence one thing at least is clear: There is no hard and fast rule prescribing the method of apportioning

alluvion formed in front of the lands of two or more riparian proprietors, the only thing definite being the precept in Article 516 of the Code that the basis of the apportionment is the extent of the front line of the proprietors.

Of much interest in the problem presented by this case is the following statement from "Elements Of The Law Of Ownership", by Fred Zengel, 3 LSA—C.C. 1, 14–15:

"It is said in the Code that the new land formed by alluvion is divided among the riparian owners 'according to the extent of the front line of each at the time of the formation of the alluvion.' This language is susceptible of at least four applications. The portion of the new area to be allocated to each adjoining landowner could be determined (1) by applying to the total new area the ratio of the frontage of each tract to the total frontage along which the new area is formed; or (2) by projecting the boundary lines of each tract along their existing directions into the new area; or (3) by projecting the boundary lines of each tract into the new area in directions which are perpendicular to the thread of the river or stream; or (4) by dividing the water edge of the new area in the same proportions as the original bank of the stream, and by joining with straight lines the corresponding segments of the new and old banks. The first and third methods have been employed judicially

but neither has become established as the prevailing rule. Each of the four methods could conceivably produce inequities; and perhaps for that reason no method will ever be recognized as the definitive one."

In a footnote this author cited the Delord, Leathers, and Akard cases, supra.

56 Am.Jur. 904, Waters, Sec. 494, in dealing with the apportionment of alluvial lands says:

"In considering the proper mode of division between adjoining riparian or littoral proprietors of additions to their lands by accretion or reliction, it should be observed that on account of the many varying conditions, *it is practically impossible to formulate a general rule by which all of the cases may be governed.* It undoubtedly is true that accretions formed in front of and contiguous to the land of several owners belong to them all, and cannot be claimed by one with whose land the first point of contact was made. The inevitable consequence of a contrary rule would be that if it could be shown that the point of contact was first made to lands of one of the riparian owners, he would be entitled thereby to the whole accretion subsequently made to the lands of other riparian owners on either side of him and thus would cut off their water boundaries and privileges. According to many authorities, such additions should be divided equitably among the riparian proprietors. The two principal objects to be kept in view in making such an apportionment are: (1) that the parties shall have an equal share, in proportion to their lands, of the area of the newly formed land, regarding it as land useful for the purposes of cultivation or otherwise, in which the value will be in proportion to the quantity; and (2) to secure to each an access to the water and an equal share of the water line in proportion to his share on the original line of the water, regarding such water line in many situations as principally useful for forming landing places, docks, quays, and other accommodations with a view to the benefits of navigation, and as such constituting an important ingredient in the value of the land.

"A rule or mode approved in many cases, *unless it results in such inequalities as to make it inequitable,* is to give the several riparian proprietors a frontage on the new shore, proportional to their frontage on the old one, connecting the respective points by straight lines. * * *" (Italics ours.)

As authority for the last quoted statement numerous cases are cited, among them being Newell v. Leathers and Deerfield v. Arms, both cited supra.

▬▬ As has been said by this court, the ownership of alluvion is a legislative donation to the riparian proprietor without which it would be public property, and consequently it is a pure gratuity by the state to the riparian proprietor. See Heirs of Delord v. City of New Orleans, supra. It follows that the state clearly intended

that the apportioning of alluvion formed in front of the property of several riparian owners should be made in such a manner as to prevent inequities as far as possible; or, stated somewhat differently, that in making such an apportionment the alluvion should be divided equitably as nearly as possible so as not to give one proprietor an advantage over the other.

■  In sum, when alluvion formed in front of the estates of riparian owners is to be divided, two objects, insofar as possible, are to be attained: (1) Each owner should receive a fair proportion of the area of the alluvion, and (2) each should receive a fair proportion of the new frontage on the water.  Because of the varying conditions which obtain in different cases, no one method of effecting a division can be prescribed which will not in some instances result in substantial inequities.  The courts can therefore do no more than take each case as it is presented and order an apportionment by the method which will most nearly attain these two objects and do justice between the parties to the particular case.

■  In the instant case river frontage, for all practical purposes, is not of much importance.  As stated previously, the U. S. Engineers in 1933 diverted the main channel of the river to some extent away from the properties, and at the present time, as disclosed by the plat or map shown

above, the main channel of the river runs down the east side of the alluvion and through Glasscock Cut-off.  Moreover, there is no showing that river frontage here has any importance for commerce or navigation.  Under these circumstances we think it would be equitable and proper in this case to order a division of the alluvion on the area basis in proportion to the respective frontage of each of the riparian owners, and that this apportionment or division should be made by drawing a line from the old dividing line of these properties to the new shore of the river as it now exists.  By such an apportionment each riparian proprietor will receive his proportion of the area and at the same time will retain a frontage on the river.

■  As we have pointed out, no actual survey has been made or dividing line established in this case, and we are not able to say what frontage or what area the riparian owners in this case will receive when the alluvion is divided as ordered above.  However, when the apportionment is made in accordance with our orders, relators are not to receive any less area than that given to them by the judgment of the Court of Appeal, for respondents did not apply to this court for a writ, and relators should not be penalized because of their own application.

It is ordered that the judgment of the Court of Appeal insofar as it ordered the

division of the alluvion to be made on a frontage-to-frontage basis be annulled, reversed, and set aside. In all other respects the judgment of the Court of Appeal is affirmed. It is now ordered that the dividing line of the alluvion be drawn so as to give plaintiffs-respondents that portion of the entire area of the alluvion as it existed at the time this action was instituted as the length of the front line of their property bears to the length of all the property to which the alluvion is attached, the apportionment to be made by drawing a line from the boundary line between the properties of these litigants to the existing river front or bank. All costs incurred in this court are to be paid by relators.

129 So.2d 729