290 So.2d 738 (1974)
Daniel A. OLIVER
v.
MILLIKEN & FARWELL, INC., et al.
No. 9710.
Court of Appeal of Louisiana, First Circuit.
February 11, 1974.
Rehearing Denied March 22, 1974.
Writs Refused May 17, 1974.
*739 Ashton L. Stewart, of Laycock, Stewart & Preis, Baton Rouge, for plaintiff-appellant.
John Pat Little, of Guste, Barnett & Little, New Orleans, Victor A. Sachse, III, of Breazeale, Sachse & Wilson, Baton Rouge, for defendant, Milliken & Farwell, Inc., appellee.
R. Gordon Kean, Jr., of Sanders, Miller, Downing & Kean, Baton Rouge, for defendant, Ashland Plantation, Inc., appellee.
Paul G. Borron, Jr., and Paul G. Borron, III, of Borron & Delahaye, Plaquemine, for defendant, appellee Devall Co., Inc.
Joseph W. Cole, Jr., of Cole & Claiborne, Port Allen, for defendant, appellee, Kean Mineral Interests & Miss.
Philip N. Pecquet, Port Allen, for defendant, Ticac, appellee.
Gordon M. White, of White & May, Baton Rouge, for defendant, Willie H. Davis, appellee.
*740 Gerald L. Walter, Jr., and Byron R. Kantrow, of Kantrow, Spaht, Weaver & Walter, Baton Rouge, for defendant, Joan Bereson and others (Seidenbach), appellee.
Felicien Y. Lozes, Rouchell, Lozes & Brown, New Orleans, for defendant, Mrs. Hermina M. Farwell (Curator ad hoc) and Felicien Y. Lozes, individually.
Before LOTTINGER, BLANCHE and CRAIN, JJ.
CRAIN, Judge.
The matter before us involves the division among riparian owners of a certain alluvial deposit commonly known as "Solitude Point" containing approximately 3,500 acres and located on the West Bank of the Mississippi River in the Parish of West Baton Rouge. This area is shown on the plat attached to this opinion. The plaintiff-appellant, Daniel A. Oliver, owner of "Batture Plantation" initiated the litigation naming Milliken and Farwell, Inc. owner of Clarkland and Smithfield Plantations as defendant. Devall Company, Inc., owner of Oak Grove Plantation which adjoins Solitude Point, intervened as did Ashland Plantation, Inc. also a riparian owner. The plaintiff then named additional parties as defendants who also owned property adjacent to Solitude Point.
Each party amended its petition to allege acquisitive prescription of various portions of Solitude Point. The matter was tried and judgment was rendered on September 1, 1972. A motion for partial new trial was subsequently granted by the trial court limited to the method of fixing the division lines across the alluvion, and a new decision was rendered on the motion amending the original judgment on May 31, 1973. From this judgment, the plaintiff appealed. Also appeals were taken from the original judgment by several riparian owners based on the trial court's adverse decision on their claims regarding acquisitive prescription.
Prior to rendering a decision regarding the division of the alluvion according to law, the trial court was called upon to decide several pleas of acquisitive prescription of portions of the alluvion urged by the various riparian owners. Regarding the claim of Milliken-Farwell, the trial court after reviewing the evidence stated:
"Defendant, Milliken & Farwell, was the only landowner who effectually attempted to substantiate its existing boundary position with affirmative evidence. . . . Milliken & Farwell, Inc., contends . . . that the boundary between it and plaintiff, Daniel A. Oliver, is a blazed and hacked line which is a projection across the batture of the line between Sections 7 & 8, T-6-S, R-12-E, which has established a boundary because of long continued recognition by the parties and/or their ancestors in title. It pleads prescription of ten, twenty and thirty years.
The Court's duty here is to examine the evidence of possession within the hacked line which is also the northern and southern boundary, respectively, established by title. It must be conceded there was no formal fixing of boundaries between the parties; consequently, the usual possession required by the Code and the jurisprudence will determine this issue. . . .
Milliken & Farwell commences its documentary possession with a timber deed dated November 18, 1926, marked `M&F 1,' whereby timber was sold to Schwing Lumber and Shingle Company, Limited, under the following description:
'All the timber of whatsoever kind and nature, lying, standing and being on a certain tract of land, situated in the Parish of West Baton Rouge, State of Louisiana, and described as the SE ¼ of section 34 in Township 6 South of Range 11 E., containing 160.14 acres, and also the cottonwood and willow timber on the entire batture in front of *741 the Smithfield Plantation, having a frontage of a mile or more on the Mississippi River, located in T. 6S. R. 12 E., in the Parish of West Baton Rouge, State of Louisiana.'
Milliken & Farwell follows this offering with 24 successive offerings in an effort to show the blazed, hacked line as the northern boundary of its batture.
For example, `M&F 1' (cited above contains a timber sale of the cottonwood and willow timber on the entire batture in front of Smithfield Plantation, having a frontage of a mile or more on the Mississippi River. This description, above, does not alleviate the batture problem presented for judgment. The remainder of the documentary offerings do not meet the 30 year requirement, nor does the evidence of physical possession.
For example, `M&F 8' conveys, as does the Schwing deed, all the batture which lies between the levee fronting the Mississippi River and the `said river,' `being the batture formed in front of said plantation.' Again, that is the very question we are attempting to decide: Wherein lies the batture? See `M&F 9' for the same indistinct description.
The ancient deeds reciting `all the batture in front of said plantations' do not mention the hacked, blazed line, nor can they be used to establish ownership of batture which has formed successively and imperceptibly to these plantations through these years as we must adhere to the ruling which requires that the subject of apportionment is the entire alluvial deposit as it existed at the time this action was instituted without respect to the time element of formation.
Defendant cites Art. 826 of the Civil Code to define a boundary as trees, as hedges, ditches, walls or inclosures in an effort to substantiate the blazed, hacked line as the boundary between Smithfield and Oliver. This article, however, must be read in conjunction with the other articles of Title V entitled `Of Fixing the Limits and of Surveying of Lands.' This article defines certain physical features which may be used as a boundary, but a legal boundary must meet the other requirements in Title V, such as the action of boundary, the judicial fixing, the extra-judicial fixing, the prescription necessary to establish ownership of the land within the confines of the boundary. When the trees and hedges have been so established, they become the boundary line. As was said in Sessum v. Hemperly, 233 La. 444, 96 So.2d 832, 843:
'Clearly, the now well-established rule, as a result of our codal provisions and the cited authorities, is that where there is a visible boundary which has been in existence for thirty years or more and the defendant in a boundary action and his predecessors in title have, in addition to the land described in the title, actually possessed land extending to that visible boundary, a plea of prescription of thirty years should be sustained. It is our view that for the rule to be applicable two conditions must concur: First, there must be a visible boundary, artificial or otherwise; second, there must be actual uninterrupted possession, either in person or through ancestors in title, for thirty years or more of the land extending beyond that described in the title and embraced within the visible bounds.'
Milliken & Farwell also pleads possession of ten and twenty years under Article 853 of the Civil Code. This article only applies to boundaries formally established by a surveyor in accordance with Articles 833-839. No such formal fixing of boundaries was evidenced here and, therefore, its plea under 853 is not tenable.
This court takes notice that there were mineral leases and timber cutting on Milliken & Farwell's batture, however, neither the timber cutting nor the mineral *742 leases are coordinated and established, possession-wise, with the land embraced to the blazed, hacked line. The court does not adhere to the proposition that a long established hacked line, absent possession of the property contained within the limits of the hacked line, is alone sufficient to constitute adverse possession of property. Acquisition by adverse possession is an unnatural creature of our law, and to be recognized, it must make itself manifest in a manner which can be understood by adjacent landowners to include land, not mere lines. To claim the property up to the blazed, hacked line, possession must be exercised up to the blazed, hacked line. Crow v. Bailey, et al. [La.App.], 47 So.2d 357, Sessum, supra. Since an action of boundary is imprescriptible, it follows that the existence of the boundary for 30 years, unaccompanied by proof that the land within its bounds, has been acquired by 30 years possession, does not establish a boundary line. Article 825, Civil Code. Article 852 speaks of uninterrupted possession during thirty years, of any quantity of land. (Italics ours)
Article 852 of the Civil Code states a rule of prescription by which one may acquire ownership of land outside one's title description if the land has been possessed within visible bounds for a period in excess of thirty years. . . .
Articles 833 and 834 detail the method of fixing boundaries, judicially or extra-judicially, and if the boundaries have been fixed according to 833 and 834, then Article 853 will permit adverse possession of ten and twenty years to come into play. Anding v. Smith [La.App.], 189 So.362.
The foregoing articles are not applicable (except 852) where the boundary line has been fixed by one owner without the consent of his neighboring owner. . . .
In the case at bar, the evidence herein does not establish defendant's (Milliken & Farwell's) continuous uninterrupted, actual, physical and corporeal possession of all of the subject property lying to the south of the purported boundary. Nor does the civil possession satisy this court as to location and extent of the batture possessed for a period of 30 continuous years."
We agree with the trial court's findings as expressed above.
Now we turn to the prescriptive claim by Willie Davis. The trial court held:
"Willie Davis, the southernmost owner among the litigants, claims that he purchased all of the batture belonging to previous owners of Cypress Hall Plantation from Prudential Insurance Company.
On June 30, 1954, for $750.00 cash, Prudential executed a deed to Davis covering its batture, described as a portion of Cypress Hall Plantation and `being all that part thereof east of the west line of the gravel road, being bounded on the NW side by the extension of the north line of Lot 1 of said plantation; on the SW by Lot 1 sold to Willie Davis and by Lots 2, 3, 4, 5 and 6 sold to Ivy Pulliam by The Prudential Insurance Company of America; on the SE by the extension of the south line of Lot 6 of said plantation, and on the NE by the Mississippi River; . . ." The deed also covered one other parcel, a narrow strip lying on the western extremities of Lots 7, 8, 9, 10, 11 and 12 of Cypress Hall Plantation, which is of no concern to this present proceeding. The Vendor reserved all rights to the minerals. The property description ended with the words `together with all right, accretions thereunto belonging or in anywise appertaining.' (See Davis Exhibit No. 2) The deed recited that the Vendor `does by these presents grant, bargain, sell, convey, transfer, assign, set over, quitclaim, release and relinquish all of the right, title and interest which it may *743 have' unto Willie H. Davis, the purchaser.
Counsel contends the 1954 deed from Prudential to Davis conveyed all of the right, title and interest of Prudential in and to all the batture in front of Lots 1 through 6 of Cypress Hall Plantation, and this quitclaim deed, coupled with actual physical possession of part of the batture, (as the extreme east end is incapable of possession because it is low, wet, marshy) is adequate to establish ownership provided Mr. Davis was in good faith.
Prudential's deed from the Sheriff, dated December 17, 1930, contained the following description:
'A certain tract of land or plantation, known as Cypress Hall Plantation, situated in the Parish of West Baton Rouge, State of Louisiana, containing 650 acres more or less, bounded North by lands of the Seidenbach Estate, East by the Mississippi River, South by Barrowsa Plantation and West by lands of Mandy Robertson, the Winterville Tract, and the lands of Adele Young. Said plantation, situated within the boundaries of Sections 60 and 84, T6S, R11E, Sections 1 and 40, T7S, R11E, and Sections 20, T6S, R12E, West of the Mississippi River.'
The public records of West Baton Rouge Parish, as reflected in Prudential's acquisition of Cypress Hall Plantation (Devall Co., Inc., Exhibit No. 2) clearly show that Prudential never acquired all of that portion of Solitude Point bounded on the northwest side by the extension of the North line of Lot 1 of Cypress Hall Plantation. On the contrary, the sheriff's deed to Prudential plainly indicates that Prudential acquired property `bounded North by lands of the Seidenbach Estate,' wherever that boundary may have been.
On June 30, 1954, Prudential conveyed unto Willie H. Davis, by quit claim deed, all of its right, title and interest in and to:
'A certain tract of land being a portion of that plantation known as Cypress Hall Plantation, situated in West Baton Rouge Parish, Louisiana, being all that part thereof East of the West line of the gravel road, being bounded on the NW side by the extension of the North line of Lot 1 of said plantation; on the SW by Lot 1 sold to Willie Davis and by Lots 2, 3, 4, 5 and 6 sold to Ivy Pulliam by the Prudential Insurance Company of America; on the SE by the extension of the South line of Lot 6 of said plantation, and on the NE by the Mississippi River;
Acquired by The Prudential Insurance Company of America by Sheriff's Deed dated February 19, 1941, and recorded in Conveyance Book 24, Entry 348, of the records of West Baton Rouge Parish, Louisiana.'
Notice the discrepancy between the description of property acquired by Prudential by Sheriff's Deed and the description contained in the quit claim deed to Davis. Prudential's acquisition recited the northern boundary to be the lands of the Seidenbach Estate whereas in the quit claim from Prudential to Davis the northerly boundary is described as `the extension of the North line of Lot 1' of Cypress Hall Plantation.
An examination of the maps introduced herein (See "Devall 10") indicates an extension of the north line of Lot 1 of Cypress Hall Plantation (as purportedly conveyed to Davis) would cut across the batture of Seidenbach, Devall, Ticac (Morris), Ashland and Milliken & Farwell, Inc., all parties defendant in this proceeding.
The decision as to what part of Solitude Point was divested to Davis by Prudential or acquired by Prudential by virtue of Sheriff sale (See Davis Exhibit No. 4) forms the very crux of this *744 case. . . . Prudential could not convey portions of Solitude Point to Davis it never really owned and the evidence indicates Davis did not really rely on this description of property which Prudential attempted to convey to him. The evidence establishes the following: Davis was aware of a survey party's efforth to apportion the alluvion in 1953, prior to Davis' acquisition; the fact that Prudential's attorney would only permit a quit claim deed; the admitted incongruity of claiming ownership of the alluvion through a projection of the alleged side boundary lines; the exclusion of the warranty clause in the quit claim deed from Prudential to Davis; the fact that two prominent attorneys examined the record for him; the fact that Prudential's title calls for a northern boundary by the Seidenbach Estate, all should have put Davis on his guard as to the confusion of the batture lines and that he could not really claim as good faith owner without 30 years possession, the batture which would inure to him from an extension of the north line of Lot 1 of Cypress Hall Plantation.
The Solitude Point problems have existed for years; the presumption is Mr. Davis knew about it personally. When he employed attorneys to examine the batture problem, he is charged with legal knowledge of the title. This discredits the proposition that the batture claimed by him could have been possessed by virtue of 10 years good faith prescription.
Thus Mr. Davis' claim fails to meet the good faith condition required by the Code because of his knowledge of this batture; the boundary dispute and his presence at a survey of Solitude Point attempted by Toxie Craft in October, 1953; the letter received by Mr. Davis dated June 17, 1954, from Prudential's attorneys stating that the property was not then assessed to Prudential on the tax rolls of West Baton Rouge Parish and that Prudential did not know whether it would ever be assessed, and further stating that they did grant him a quit claim deed to the property; the very deed itself which states as follows:
'Without any warranty of title, nor for any liability for the return of the purchase price, or for any charges or fees resulting from a possible eviction or from any other cause.'
all placed him on notice that acquisition of Solitude Point could not be accomplished under the 10 year good faith acquisitive period. The fact that he investigated the public records in order to determine the validity of vendor's title, under Louisiana law, puts the vendee on notice of any defect in the title. This is true even though the attorney examining the records in his behalf may have erroneously reported his vendor's title to be valid. It is further the law of Louisiana that even though Mr. Davis may not have been aware of any of these facts or title defects, he was nevertheless not a good faith purchaser of the property because a purchaser of property under error of law cannot acquire a good faith prescriptive title when his alleged good faith was based on an error of law. See Dinwiddie v. Cox [La.App.], 9 So.2d 68, 2d Cir. 1942; Wells v. Blackman, 46 So. 437, 121 La. 394. Further, the record in this case does not indicate that Mr. Davis' possession meets the requirements of good faith under 10 years acquisitive prescription as he did not show that his possession has been adverse to the other claimants, continuous and uninterrupted, peaceable, public and unequivocal. Articles 3451, 3479, Civil Code, Malone v. Fowler [La.App.], 228 So.2d 500, (3d CCA) 1969; Knight v. Berwick Lumber Co., 130 La. 233, 57 So. 900 (1912); Dinwiddie v. Cos [La.App.], 9 So.2d 68; Juneau v. Laborde, 219 La. 921, 54 So.2d 325; Martin v. Schwing Lumber & Shingle Co., Inc., 228 La. 175, 81 So.2d 852.
Again, with reference to Davis, we agree with the trial court's findings.
*745 Although several other proprietors filed exceptions of acquisitive prescription, they did not produce any real proof to support them. Thus the trial court was correct in overruling these claims.

DIVISION OF THE ALLUVION
Three primary issues with reference to division of the alluvion were presented to the trial court, and are again urged on appeal. First, fixing the extent of frontage on the river originally enjoyed by the various riparian owners. Secondly, whether to apportion the ownership of the alluvial deposit to the various riparian owners as the deposits were formed intermittently through the years, or consider the deposit forming over the years as a whole without regard to any growth by stages, apportioning the alluvion as it exists when division is sought. Thirdly, the method of apportioning the alluvion.
Considering the first issue, Article 516 of the Civil Code provides as follows:
Article 516. "If an alluvion be formed in front of the property of several riparian proprietors, the division is to be made according to the extent of the front line of each at the time of the formation of the alluvion."
The trial court was confronted with the problem of determining as a matter of fact first, when the alluvion began to form; secondly, what was the proportionate frontage of each proprietor at the time. Under Article 516, the original front line is the basis for dividing the alluvion.
The trial court initially sided with defendants holding that an 1836 plat, which was the first corporate map showing the location of the various headrights and sections in Township 6, Range 11 and 12 east in reference to the river, should form the basis of the frontage determination. However, on the motion for new trial, it was held that 1806 frontages as computed by Dr. C. O. Dunham by comparing and overlying various maps showing claims filed with the United States government at that time, more correctly showed the extent of the respective boundaries on the river at the beginning stages of alluvial formation. This ruling was made with the understanding that the plaintiff's expert could mathematically ascertain the boundaries by comparing various plats showing individual claims. Upon submission of the maps by the expert the trial court found . . . "an incomplete computation for the original frontage at the lowest part of Solitude Point." Furthermore, the court determined that the 1836 government plat was complete enough to enable mathematical computation of the frontages. For this reason, the trial court finally determined that the 1836 land survey together with the field notes should be the basis upon which the original frontage should be calculated. Of course, the trial court made allowance for any rescission of properties of the various owners after 1836. The trial court's ruling is as follows:
"b The original frontage line to be determined as the bank lines of maximum westward recession of the Mississippi River reached by the River from 1836 to the present date as recorded with the 1836 land survey and subsequent river surveys. This original frontage line follows with the meanders recorded in the 1836 land survey field notes from section 5 through section 16; thence with the bank line of maximum westward recession as recorded with the official Mississippi River Surveys to the lower end of the lands involved in this suit."
In this ruling, the trial court ordered the utilization of the most clear evidence upon which the required mathematical computations could be made. It found, as a matter of fact, the 1836 survey was the first accurate determination of the boundaries of the various owners as they related to one another and the Mississippi River. The trial court was not manifestly erroneous in choosing the 1836 survey as the basis for computing the original frontage.
Regarding the issue of the point in time in which the alluvion should be apportioned to each owner, the trial court cited the Louisiana Supreme Court decision of *746 Jones v. Hogue, 241 La. 407, 129 So.2d 194 (1960). In that case, citing the language of the Court of Appeal in the same case, the Court held:
"It is our opinion that courts must and should accept the extent and area of an alluvial deposit as it exists, be it much or little, at the time the apportionment between riparian owners is sought. To decide otherwise would have the impractical effect of holding that alluvial deposits must be apportioned, foot by foot, as they are formed." 129 So.2d p. 199.
The above ruling of the Supreme Court is that the alluvion as an entirety should be apportioned as of the time the suit to divide the alluvion is commenced. Although plaintiff contends that the case at bar differs from the Jones case in that in the case before us proof could be adduced to show the exact points in time of the various alluvial formations, we hold that the rule of the Jones case is applicable regardless of the possibility of proof of the separate alluvial formations, and we agree with the holding of the trial court on this point.
The third issue relates to the method of apportionment of the alluvion. The plaintiff contends that the apportionment should be accomplished by drawing a line from the point of original frontage on the river perpendicular to the river as it now exists. The result of this would vest in plaintiff the ownership of the vast majority of the alluvion. The trial court, basing its decision on the Jones case, supra, rejected this method holding that it would result "in a chaotic blockage of what were heretofore riparian owners." We agree. The Court in the Jones case held that:
"In sum, when alluvion formed in front of the estates of riparian owners is to be divided, two objects, insofar as possible, are to be attained: (1) Each owner should receive a fair proportion of the area of the alluvion, and (2) each should receive a fair proportion of the new frontage of the water." Jones v. Hogue, supra, p. 202.
The Court went on to say that no one method could be adopted as a hard and fast rule, but that each case should be considered individually with an eye toward fairness and equity. The case of the perpendicular line method would result in the plaintiff's receiving according to its original frontage a disproportionately large percentage of the acreage and the new frontage, thus violating the tenets of the Jones case. Consequently, this method of apportionment was correctly discarded by the trial court.
In its original opinion the trial court ordered that the boundaries be fixed by utilizing both a frontage to frontage, and frontage to acreage method in an attempt to provide a fair proportion of acreage and frontage to each riparian owner. However, a limited new trial was granted when it became apparent that the expert the court appointed to carry out its order was having difficulty in drawing boundary lines.
On the motion for new trial, the expert testified that as a practical matter the apportionment based on a combination of the two methods could not be accomplished in such a fashion as to fairly, equitably, and satisfactorily produce boundaries between the various owners. He testified that very irregular and curving boundaries would be required and that this would result in ridiculously shaped plots. The trial court then determined that if both approaches could not be utilized in conjunction with one another, that the frontage to frontage method was most equitable in this case.
Although no written reasons were given, the record indicates that the trial court found that the real value of ownership in Solitude Point stemmed from the frontage on the river. Use of the frontage to acreage method would result in the various owners receiving a disproportionate amount of the frontage when compared to the frontage enjoyed when the alluvion began to form. For example, one of the lower riparian owners would receive substantially *747 more frontage than his neighboring owners when the original frontage of their ancestors in title at the time the alluvion began to form was substantially the same. The use of the frontage to frontage method would, of course, alleviate this problem. Although the lower proprietors would lose some acreage under the frontage to frontage approach, the expert testified that alluvion was expected to continue to form on the lower part of Solitude Point to a greater extent and at a faster rate than on the upper portions, thus resulting in a diminishing acreage disparity. The results obtained for the middle proprietors would not vary significantly under either approach. We feel the trial court was correct and its decision in this regard follows the principles announced in Jones v. Hogue, supra. Viewed as a whole, the frontage to frontage method would produce the fairest results for all the riparian owners in this case.
For the reasons cited above, the trial court's judgment is affirmed. All cost of this appeal to be paid by plaintiff-appellant.
Affirmed.