574 So.2d 455 (1991)
CITIES SERVICE OIL AND GAS CORPORATION, et al., Plaintiff/Appellant,
v.
The STATE of Louisiana, et al., Defendant/Appellant.
No. 21998-CA.
Court of Appeal of Louisiana, Second Circuit.
January 23, 1991.
Rehearings Denied February 21, 1991.
Writs Denied April 26, 1991.
*456 Blanchard, Walker, O'Quin & Roberts by J. Jay Caraway and Reginald W. Abrams, for OXY USA, Inc. & Crystal Oil Co. (Formerly Cities Service).
Smith, Taliaferro, Seibert, Booth & Purvis by J.W. Seibert, III, for Dauphin Group.
Comegys, Lawrence, Jones, Odom and Spruiell by William Paul Lawrence, II, for Clements Group.
Walker, Tooke, Perlman, Lyons and Greer by J. Broocks Greer, III, for Greer Group.
Wallace and Southerland by James D. Southerland, for Gore Group.
S. Dewayne Broussard Asst. Atty. Gen., for State of La.
Shuey and Smith by John M. Shuey, Jr., for Mobley Group.
Before MARVIN, LINDSAY and HIGHTOWER, JJ.
LINDSAY, Judge.
This appeal arises from the rendition of a partial summary judgment in a concursus proceeding invoked to determine ownership of about $15,000,000 in mineral revenues from a 160-acre unit in Caddo and Bossier Parishes. Three groups of litigants appeal. Three other groups of litigants answer the appeals. For the reasons expressed herein, we affirm the trial court judgment.

FACTS
In 1981, the Louisiana Office of Conservation unitized an area which it designated as Unit CV RA SU 32. This unit is located in the south-east quarter (SE/4) of Section 8, T23N, R14W. Furthermore, it lies within the flood plain of the Red River near the boundaries between Caddo and Bossier Parishes. In 1982, the Operators jointly drilled the Clements "B" No. 1 Well as the unit well.
In 1985, the Operators filed this concursus proceeding to determine ownership of the revenues produced from Unit CV RA SU 32. Distribution of these proceeds is complicated by the westward movement of the river between 1966 and 1978, which changed the ownership of the surface of the land. The river moved west from Section 9, T23N, R14W into the southeast quarter of Section 8, T23N, R14W. This movement was halted by revetment work done by the Army Corps of Engineers in 1979.
Seven different groups of litigants claim various interests in the mineral revenues at issue. These litigants are the State, the Operators, the Greer Group, the Clements Group, the Gore Group, the Dauphin Group and the Mobley Group.
The schematic drawing below, which is based upon Joint Exhibit # 15, generally illustrates the movement of the river from east to west. Reference to this illustration may also be somewhat helpful in appreciating the general positions of the respective parties. The area claimed by the Clements Group is marked with diagonal (/) lines. *457 The area claimed by the Gore Group is marked with horizontal () area claimed by the Dauphin Group is deslines, while the designated with vertical (l) lines.

The claims of the State of Louisiana are based upon its ownership of the bed of the Red River. The Greer Group's interest arises from a lease granted to it by the State in 1972 which covered the river bed.
The Clements Group owned property which was west of the river as it existed in 1972. The Gore Group and the Dauphin Group claim ownership of contiguous riparian land east of the 1972 river bed. (The Gore Group owns the northern section of this land while the Dauphin Group owns the southern section.) The Mobley Group claims interests derived from members of the Clements Group and the Gore Group.
Additionally, the Operators, the companies who invoked the concursus proceeding (Cities Services Oil & Gas Corporation, now OXY USA, Inc., and Crystal Oil Company), also claim mineral interests obtained from members of several of the other groups.
During the time the river moved westward, the lands claimed by the Clements Group were subject to two different mineral leases. One of these leases was granted *458 in 1963 and expired in 1973. The other was granted in 1974 and expired in 1978. Both were recorded in Caddo Parish. In March of 1980, during the drilling of the unit well, four mineral leases were executed by members of the Clements Group. These leases covered all of the SE/4 of Section 8 lying west of the river and were recorded in both Bossier and Caddo Parishes. In December, 1980, Mission Plantation, Inc., a faction of the Clements Group which was the record owner of land lying west of the river since 1978, executed a mineral lease which purported to cover all of the SE/4 of Section 8. It was recorded in both parishes.
At all times, the State owned the river bed below the ordinary low water mark in Sections 8 and 9. On November 8, 1972, the State granted State Lease 6002 to the Greer Group. This lease covered the riverbed.[1]
On June 26, 1989, the parties filed a joint motion for partial summary judgment, seeking resolution of the basic liability issue under LSA-R.S. 9:1151, the so-called "Freeze Statute". They specifically reserved for trial all disputed issues and the issue of quantum. In furtherance of the joint motion for partial summary judgment, the parties entered into detailed stipulations of fact.
After the case had been submitted for decision, the trial court handed down written reasons for judgment. In its written opinion, the trial court found that the State Lease did not move westward with the river. The court held that the State Lease continued to affect the old riverbed. In so holding, the court relied upon the language of the State Lease itself:
"All the lands now or formerly constituting the beds and bottoms of all water bodies of every nature and description and all islands and other lands formed by accretion or reliction, except tax lands, owned by and not under mineral lease from the State of Louisiana on September 1, 1972, situated in Bossier and Caddo Parishes ..." [Emphasis added by the trial court]
As to the Clements Group, the trial court found that since its leases were only recorded in Caddo Parish, they did not affect Bossier Parish property as to third persons. As a consequence of this application of the public records doctrine, when the Gore and Dauphin Groups acquired the property east of the river as the river moved westward, their acquisitions were in full ownership up to the Bossier Parish line (except for the former riverbed which was covered by State Lease 6002).
The trial court found that the Freeze Statute only applied where: (1) ownership of the land changed as a result of the movement of the river; and (2) an oil and gas lease existed on the newly acquired land, under the terms of which the former owners, lessors, lessees, royalty owners and mineral owners had already acquired rights. In the absence of a lease, the land acquired by accretion came to the new owner in full ownership. However, if the land was acquired subject to a lease, the rights of the lessees and lessors were protected only for as long as the lease continued to be in effect. Upon expiration of the lease, all mineral rights reverted to the new owner who had acquired the surface of the property by accretion.
Applying this interpretation to the facts before it, the trial court determined that, upon the expiration of the 1974 Clements lease in 1978, the mineral rights of the Clements Group in the new riverbed expired. Since that time, the State has owned the new riverbed free of the Clements lease. The expiration of the Clements lease in 1978 also allowed the Gore and Dauphin Groups to acquire the Caddo Parish property east of the new riverbed in full ownership. (This was in addition to its acquisition, in full ownership, of the Bossier property previously mentioned.) The trial court held that the 1980 Clements lease now affects only the Caddo Parish property west of the present riverbed.
*459 Thereafter, a judgment was signed which concisely summarized the trial court's findings, providing that the State Lease applied to the river bed as it existed when the lease was granted in 1972 and that it did not affect the present river bed. However, as to the former riverbed, the Freeze Statute maintained the mineral ownership rights of the parties to the 1972 State Lease. The trial court held that the Freeze Statute did not maintain the mineral rights of the Clements Group to the land acquired by the State in the present riverbed. Nor did the Freeze Statute prevent the Gore and Dauphin Groups from acquiring, in full ownership, the land between the old and new riverbeds.
The Clements Group, the Operators, and the Greer Group all appealed from the trial court judgment. The Gore Group, the Dauphin Group, and the Mobley Group answered the appeals. (Inasmuch as the claims of the Mobley Group are entirely derived from members of other groups, we will not address its claims separately.)
The parties have presented a variety of assignments of error. These assignments of error present the following issues for resolution:
(1) the trial court erred in finding the Freeze Statute constitutional;
(2) the trial court erred by going beyond the scope of the joint motion for partial summary judgment by ruling that the State Lease does not affect the present riverbed; and
(3) the trial court erred in its application of the Freeze Statute to the stipulated facts.

CONSTITUTIONALITY OF FREEZE STATUTE
Several of the parties have attacked the constitutionality of LSA-R.S. 9:1151, which is commonly known as "the Freeze Statute". They argue that the application of the statute results in an unconstitutional taking of the riparian landowners' rights to acquire future alluvion, a vested right. The parties supporting the constitutionality of the statute contend that future alluvion is a legislative donation which the legislature may choose to alter, and that the Freeze Statute is a valid exercise of this legislative prerogative.
LSA-R.S. 9:1151 provides as follows:
In all cases where a change occurs in the ownership of land or water bottoms as a result of the action of a navigable stream, bay or lake in the change of its course or bed, or as a result of accretion, dereliction, or other condition resulting from the action of a navigable stream, bay or lake, the new owner of such lands or water bottoms, including the state of Louisiana, shall take the same subject to and encumbered with any oil, gas and/or mineral lease covering and affecting such lands or water bottoms, and subject to the mineral and royalty rights of the lessors in such lease, their heirs, successors and assigns, the right of the lessee or owners of such lease and the right of the mineral and royalty owners thereunder to be in no manner abrogated or affected by such change in ownership. [Acts 1952, No. 341, § 1.]
In its written opinion, the trial court rejected all claims of the statute's unconstitutionality. In so holding, the court relied upon State v. Placid Oil Company, 274 So.2d 402 (La.App. 1st Cir.1972), reversed and rendered on other grounds, 300 So.2d 154 (La.1973).
In State v. Placid Oil Company, supra, the First Circuit rejected the claims of Placid, which was both the operator and a mineral lessee, that the statute unconstitutionally violated its rights against deprivation of property without due process of law and impairment of contract obligations. The appellate court stated:
... We find no merit in the assertion of unconstitutionality of the statute in question, provided it be given prospective and not retrospective effect. It is clear that but for another statutory provision, namely, Louisiana Civil Code Article 509, the State of Louisiana and not the defendants would own the area comprised of alluvion in controversy herein. There is nothing which precludes the Louisiana Legislature from prospectively modifying by subsequent legislation such as Act *460 341 of 1952, LSA-R.S. 9:1151, the effect which would otherwise obtain by virtue of Civil Code Article 509. There is nothing discriminatory in the 1952 legislative act in question, as it applies equally in favor of or against the State as it does in favor of or against private landowners. The Louisiana Legislature could have repealed in toto Louisiana Civil Code Article 509, following the effective date of which legislative repeal alluvion would remain the property of the State instead of becoming the property of the riparian landowners. The fact that the 1952 legislative act in question simply modifies the effect of, rather than repeals entirely, Louisiana Civil Code Article 509, does not gainsay its constitutionality when applied prospectively....[2]
274 So.2d at 419
On original hearing, the Supreme Court briefly discussed the constitutional challenge and stated that:
The Court of Appeal correctly rejected this contention and found Act 341 of 1952 constitutional and applicable in this case.[3]
300 So.2d at 166
The constitutionality of this statute was addressed by LSU Law School Professor Lee Hargrave, the Legal Research Coordinator of the Louisiana Constitutional Convention of 1973, in his law review article, "Statutory" and "Horatory" Provisions of the Louisiana Constitution of 1974, 43 La. Law Review 647, 661-662 (1983). He wrote:
Although the convention did not adopt provisions similar to Louisiana Revised Statutes 9:1151, [footnote omitted] which provides that rights under outstanding mineral leases are not affected by changes in ownership resulting from changes in water bodies, the statute remains in effect and is not prohibited by the constitution. Nothing is taken from the riparian landowner who has gained land by accretion if he obtains the land without the mineral rights; he had no vested interest in the land to begin with. Article IX, section 3 does not prohibit the state, which obtains land by dereliction, from obtaining less than full ownership, as no alienation or authorization of alientation [sic] has occurred.
In Jones v. Hogue, 241 La. 407, 129 So.2d 194 (1960), the Supreme Court held that ownership of alluvion is a legislative donation to the riparian proprietor without which it would be public property, and consequently it is a pure gratuity by the state to the riparian proprietor.
The parties opposing the constitutionality of the statute cite Bonelli Cattle Company v. Arizona, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973), in support of the proposition that under federal law the right to future alluvion is a vested right. However, Bonelli was overruled in Oregon ex rel State Land Board v. Corvallis Sand and Gravel Company, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977). The court held that state law governs issues relating to riparian property, like other real property, "unless some other principle of federal law requires a different result." Corvallis, 97 S.Ct. at 591. The present case presents no such principle requiring application of federal law. The law of the State of Louisiana is to be applied. As stated above, the Louisiana Supreme Court has held, in Jones v. Hogue, supra, that ownership of alluvion is not a vested *461 right, but a legislative donation which may be altered or controlled by the legislature.
Based on the foregoing, we find that the Freeze Statute is constitutional within the context of this case. This assignment of error has no merit.

APPROPRIATE SCOPE OF TRIAL COURT RULING
The Greer Group and the Operators contend that the trial court erred in finding that State Lease 6002 does not affect the present riverbed. They contend that such a finding exceeds the scope of the joint motion for partial summary judgment and that it disregards the State's admissions to the contrary in its pleadings and briefs.

Scope of Motion
The parties who oppose the trial court's ruling that the State Lease does not cover the present riverbed argue that the only issue before the court on the joint motion for partial summary judgment was the application of R.S. 9:1151. They argue that the application of the Freeze Statute only concerned the Gore and Dauphin Groups, and that the issue of the ownership of the present riverbed did not involve any interpretation or application of the Freeze Statute.
We disagree. While it is true that the trial court was required to address the issue of the Freeze Statute's effect on the property owned by the Gore and Dauphin Groups, the trial court was also required to determine the effect of the State Lease after the movement of the river. The trial court was required to determine whether the lease remained with the old riverbed, whether it moved to the present riverbed or encompassed all land between the old and the new riverbeds. Thus, a thorough resolution of the effect of the Freeze Statute on the property at issue required a determination of the current status of the mineral ownership of the new riverbed.

Judicial Confession
Additionally, the Operators and the Greer Group argue that the trial court ruling on this issue ignores the judicial admissions and confessions made by the State in its pleadings and briefs. They contend that the State admitted that it had leased all of its mineral interests within the unit to the Greer Group, including its mineral interest in the new bed of the river.
LSA-C.C. Art. 1853 provides:
A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it.
A judicial confession is indivisible and it may be revoked only on the ground of error of fact.
In Howard Trucking Company, Inc. v Stassi, 485 So.2d 915 (La. 1986), cert. denied 479 U.S. 948, 107 S.Ct. 432, 93 L.Ed.2d 382 (1986), the plaintiff argued that the defendants were bound by their "confession" in bankruptcy court proceedings that certain agreements were leases, not contracts of sale. The Supreme Court found Article 1853 inapplicable. It held that a judicial admission or confession is the express acknowledgment of adverse fact. Furthermore, questions of law cannot be confessed or admitted, and the legal characterization of the contracts was "preeminently of that nature."
Under the stipulations presented in the present case, the effect of the 1972 State Lease was clearly a question of law. Therefore, the trial court was entitled to apply the law to the legal documents before it without being hindered by any erroneous assumptions of law by the parties. Additionally, we note that at oral argument the Greer Group specifically renounced any desire for this portion of the case to be returned to the trial court for additional consideration of the effect of the State Lease and the area covered thereby.
This assignment of error has no merit.

EFFECT OF THE FREEZE STATUTE
Although the various parties list numerous additional assignments of error, we find that they all embody the same basic issuethe actual effect of the Freeze Statute on the stipulated facts. We generally *462 summarize the contentions of the parties as follows.

The Clements Group
The Clements Group contends it should be recognized as owner of the mineral rights in its land which was taken by the river. (It concedes its loss of title to the surface of the land now lying within the new riverbed and east thereof.) It argues that its mineral rights in the property did not expire with its mineral leases in 1978. The Clements Group contends that the Freeze Statute creates an implied reservation of minerals in favor of the former landowner and that the taking of the surface by the movement of the river should be likened to a conveyance of the land, made subject to existing mineral leases and mineral rights by operation of law. It further contends that the mineral rights so preserved are imprescriptible. It also objects to the trial court's application of the public records doctrine.

The Operators and the Greer Group
The Operators and the Greer Group agree with the trial court's resolution of the claims of the Clements Group. However, they disagree with the trial court's ruling that the State Lease only covers the former riverbed instead of moving with the river. They contend that the trial court's narrow reading of the property description contained in the State Lease ignores the conditional nature of the State's title to the riverbed. They describe the riverbed as a "moving target" which by its nature is not stationary. Thus, the State Lease should follow the river wherever it moves. They contend that to hold otherwise would destabilize all of the State's leases affecting water bodies.

Gore and Dauphin Groups
The Dauphin Group's sole complaint about the trial court's opinion is its recognition of the State's mineral rights ownership and the Greer Group's leasehold rights in and to the former riverbed. (Both the Gore and Dauphin Groups contend that the State Lease affects only the present riverbed.)
This group argues that the Freeze Statute should be viewed as a limited attempt by the legislature to "freeze" or stabilize rights under mineral leases which are in existence at the time production is actually obtained on the leased property. Under such an interpretation, landowners would not be able to preserve their mineral rights by executing "sham" leases under which production was never intended.
The Gore Group generally concurs with the Dauphin Group. It argues that, under the most reasonable interpretation of R.S. 9:1151, mineral lessors and lessees are protected only when production is taking place when the leased land undergoes a change of ownership as a result of the movement of a navigable stream.

The State
The State supports affirmation of the trial court judgment. The State contends that under the Freeze Statute the 1972 State Lease covered the riverbed as it existed at the time the lease was executed. The natural movement of the river resulted in new ownership of the surface of the former riverbed, but the new owners of the surface took the land subject to previously executed and recorded mineral lease. Further, the state argues that it also owned the new bed of the river, subject to any existing mineral leases which were executed and recorded prior to the movement of the river. The State argues that when the Clements' 1963 and 1974 leases expired, the effects of the Freeze Statute likewise terminated and the state owned the new bed of the river free and clear of the Clements' former rights to the minerals.

DISCUSSION
We find that the trial court properly interpreted and applied the Freeze Statute to the facts before it. Under the statute, outstanding mineral rights are not affected by a change in ownership of navigable water bottoms. A. Yiannopoulos, Property § 46, in 2 Louisiana Civil Law Treatise (2d Edition 1980).
*463 As observed by the trial court, the statute clearly and unambiguously applies only when there is a change of ownership of land or water bottoms caused by the action of a navigable stream and there is in effect a mineral lease covering and affecting the lands or water bottoms. However, contrary to the assertions of the Gore and Dauphine Groups, the statute does not require that there be actual mineral production from the leased land in order for the statute to be effective.
We have considered the numerous arguments set forth by the Clements Group and find them to be meritless. The statute clearly does not establish imprescriptible mineral rights. LSA-R.S. 9:1152, which specifically grants an imprescriptible mineral servitude to an agency or political subdivision of the State, if the state acquires the land of the agency or political subdivision as a result of the movement of a navigable water body, does not "supplement" the Freeze Statute, R.S. 9:1151. This is made clear by R.S. 9:1152(C), which specifically states:
Nothing contained herein shall have the effect of modifying or repealing R.S. 9:1151.
Furthermore, the provisions of LSA-R.S. 31:149-151 fail to support the arguments of the Clements Group. These articles of the Mineral Code apply to contractual acquisitions or judicial expropriations of land by the government or certain conservation groups where the act of acquisition or judgment contains a specific reservation of mineral rights. In such cases, the prescription of nonuse does not run against these mineral rights so long as the title is not transferred again.
The Clements Group further complains of the trial court's application of the public records doctrine. Inasmuch as the leases at issue expired prior to the drilling of the unit well, the issue of whether they were recorded in Bossier Parish is of no importance.
Additionally, the Clements Group contends that the trial court did not protect its real rights in the minerals underlying its property, but treated its rights only as personal rights derived from the mineral leases. We see no evidence of such an assumption in the trial court's opinion. To the contrary, the trial court treated these mineral rights as real rights which were subject to termination or alteration due to the movement of the river, all in accordance with Louisiana law. LSA-C.C. Art. 499.
Furthermore, we find no error in the trial court's determination that the State Lease remained with the former riverbed and did not move to the new bed. The lease itself provides a description of the property it covers. It states that it covers land "now or formerly" constituting the riverbed owned by the State on a specific date, September 1, 1972. It does not provide that the lease will follow the movement of the river. Consequently, we find no merit in the arguments of the Operators and the Greer Group.
In summary, we find that the trial court correctly interpreted and applied the Freeze Statute to the facts before it. The assignments of error pertaining to the application of the Freeze Statute are without merit.

CONCLUSION
Based on the foregoing, the trial court judgment is affirmed. Costs are to be assessed equally among the Clements Group, the Operators, the Greer Group, the Dauphin Group, the Gore Group and the Mobley Group.
AFFIRMED.

APPLICATION FOR REHEARING
Before MARVIN, NORRIS, LINDSAY, HIGHTOWER and VICTORY, JJ.
Rehearing denied.
NOTES
[1] This 1972 lease (State Lease 6002) has been maintained by other production not relevant to this suit.
[2] Former Civil Code Article 509 was replaced by present Article 499 in 1980. The present article provides as follows:

Accretion formed successively and imperceptibly on the bank of a river or stream, whether navigable or not, is called alluvion. The alluvion belongs to the owner of the bank, who is bound to leave public that portion of the bank which is required for the public use.
The same rule applies to dereliction formed by water receding imperceptibly from a bank of a river or stream. The owner of the land situated at the edge of the bank left dry owns the dereliction.
The revised article reproduced the substance of Article 509 and did not change the law.
[3] On rehearing, the Supreme Court reversed its holding as to the classification of the water body involved in the litigation and rendered the constitutionality of the statute moot. However, there was no indication that the court had modified its view that the statute was constitutional.